POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY DUNN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| UPSTART HOLDINGS, INC., DAVE GIROUARD, SANJAY DATTA, PAUL GU, and CHANTAL RAPPORT, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

Plaintiff Anthony Dunn ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Upstart Holdings, Inc. ("Upstart" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

1

Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Upstart securities between May 14, 2025 and November 4, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Upstart, together with its subsidiaries, operates a cloud-based artificial intelligence ("AI") lending platform in the U.S. Its platform includes unsecured personal loans, small dollar loans, auto refinance, auto retail loans, auto secured personal loans, and home equity lines of credit.

3. Upstart purportedly uses its proprietary AI models to, *inter alia*, more accurately quantify the true risk of a loan, a process that it refers to as "risk separation." The Company claims that this differentiated approach to underwriting has generally led to higher approvals and lower interest rates relative to traditional lending practices, providing more predictable returns to its capital partners, including banks, credit unions, and institutional investors. Defendants periodically calibrate Upstart's AI models to improve accuracy and automation of loan approvals.

4. In early May 2025, Upstart launched the latest iteration of its AI model, referred to as "Model 22". At all relevant times, Defendants touted the purported accuracy of Model 22, claiming that it was increasing loan approval rates and, accordingly, the Company's revenues and growth. For example, in February 2025, Upstart issued financial guidance for the full year ("FY")

2

of 2025, including, *inter alia*, revenue of approximately $1 billion, which included revenue from fees of approximately $920 million. In May 2025, Defendants slightly raised the foregoing guidance to revenue of approximately $1.01 billion, which still included revenue from fees of approximately $920 million. Then, in August 2025, Defendants substantially raised the foregoing guidance to revenue of approximately $1.055 billion, which included revenue from fees of approximately $990 million – $70 million more than previously projected – citing improvements in performance driven by Model 22.

5.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Model 22 frequently overreacted to negative macroeconomic signals in performing its risk-separation processes; (ii) accordingly, Model 22's overall accuracy and propensity to increase loan approval rates was overstated; (iii) Model 22's overly conservative assessment of credit and macroeconomic conditions was having a significant negative impact on Upstart's revenue results, rendering the Company's previously issued FY 2025 revenue guidance unreliable and/or unrealistic; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.    The truth began to emerge on November 4, 2025, when Upstart issued a press release reporting its financial results for the third quarter ("Q3") of 2025. Upstart reported, *inter alia*, Q3 2025 revenue of $277 million, missing its previously issued Q3 2025 revenue guidance of approximately $280 million, as well as consensus estimates by $2.62 million. Upstart also reported that it expected to generate revenue of only $288 million in the fourth quarter ("Q4") of 2025, significantly below consensus estimates of $303.7 million. Further, Upstart negatively revised its FY 2025 revenue guidance to approximately $1.035 billion, versus the $1.06 billion

3

consensus estimate and its prior guidance of approximately $1.055 billion, as well as its expected FY 2025 revenue from fees, which it reduced to approximately $946 million from its prior outlook of approximately $990 million.

7.    The same day, during a related earnings call, Defendants blamed Upstart's disappointing results on Model 22, which they revealed had "overreact[ed]" to macroeconomic signals in the quarter, reducing borrower approvals and conversion rates.  Defendants also acknowledged that they had "knowingly" calibrated their AI model to be "more conservative on the credit side in earlier parts of the quarter", and that the negative impacts of Model 22's "overresponsive[ness]" to macroeconomic signals in the quarter would continue to negatively impact revenues in Q4 2025, resulting in Upstart's negatively revised FY 2025 financial guidance.

8.    Following these disclosures, Upstart's stock price fell $4.49 per share, or 9.71%, to close at $41.75 per share on November 5, 2025.

9.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Upstart is headquartered in this District, Defendants

4

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

conduct business in this District, and a significant portion of Defendants' activities took place within this District.

13.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

14.    Plaintiff, as set forth in the attached Certification, acquired Upstart securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.    Defendant Upstart is a Delaware corporation with principal executive offices located at 2950 South Delaware Street, Suite 410, San Mateo, California 94403.  The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "UPST".

16.    Defendant Dave Girouard ("Girouard") served as Upstart's Chief Executive Officer ("CEO") at all relevant times.  Defendant Girouard is also a co-founder of Upstart and has served as the Company's Chairperson of the Board of Directors (the "Board") at all relevant times.  During the Class Period, Defendant Girouard sold 208,335 shares of Upstart's stock, reaping proceeds of over $13.5 million.

17.    Defendant Sanjay Datta ("Datta") has served as Upstart's Chief Financial Officer ("CFO") at all relevant times.  Defendant Datta also serves as the Company's President and Chief Capital Officer.  During the Class Period, Defendant Datta sold 26,985 shares of Upstart's stock, reaping proceeds of over $1.4 million.

5

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

18.     Defendant Paul Gu ("Gu") served as Upstart's Chief Technology Officer ("CTO") at all relevant times.  Defendant Gu is also a co-founder of the Company, serves as a Director on the Company's Board, and will begin serving as Upstart's CEO on May 1, 2026.  During the Class Period, Defendant Gu sold 5,000 shares of Upstart's stock, reaping proceeds of over $344,000.

19.     Defendant Chantal Rapport ("Rapport") served as Upstart's Chief Marketing Officer ("CMO") and Senior Vice President ("SVP") of Growth at all relevant times.

20.     Defendants Girouard, Datta, Gu, and Rapport are collectively referred to herein as the "Individual Defendants".

21.     The Individual Defendants possessed the power and authority to control the contents of Upstart's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Upstart's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Upstart, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Upstart and the Individual Defendants are collectively referred to herein as "Defendants".

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Upstart, together with its subsidiaries, operates a cloud-based AI lending platform in the U.S.  Its platform includes unsecured personal loans, small dollar loans, auto refinance, auto retail loans, auto secured personal loans, and home equity lines of credit.

24.     Upstart purportedly uses its proprietary AI models to, *inter alia*, more accurately quantify the true risk of a loan, a process that it refers to as "risk separation."  The Company claims that this differentiated approach to underwriting has generally led to higher approvals and lower interest rates relative to traditional lending practices, providing more predictable returns to its capital partners, including banks, credit unions, and institutional investors.  Defendants periodically calibrate Upstart's AI models to improve accuracy and automation of loan approvals.

25.     In February 2025, Upstart issued FY 2025 revenue guidance of approximately $1 billion, which included revenue from fees of approximately $920 million.

26.     In May 2025, Defendants slightly raised Upstart's FY 2025 revenue guidance to approximately $1.01 billion, which included revenue from fees of approximately $920 million.

27.     In early May 2025, Upstart launched the latest iteration of its AI model, referred to as "Model 22".  At all relevant times, Defendants touted the purported accuracy of Model 22, claiming that it was increasing loan approval rates and, accordingly, the Company's revenues and growth.

### Materially False and Misleading Statements Issued During the Class Period

28.     The Class Period begins on May 14, 2025, when Upstart hosted its first "AI Day" investor event in New York City,[1] during which the Individual Defendants highlighted purported

---

[1] This event began during pre-market hours.

advancements in the Company's proprietary AI underwriting technology.  The investor presentation deck for that event stated that Upstart's proprietary AI "*[m]odel accuracy drives more approvals*",[2] and contained multiple graphics depicting how its use of that model purportedly drove higher approval rates than traditional underwriting models.

29.     The same day, Upstart issued a press release entitled "Upstart Showcases AI Breakthroughs and Business Momentum at Inaugural 'AI Day'", summarizing the event and each of the Individual Defendants' representations regarding the purported accuracy and benefits of the Company's AI technology:

> At the event, [Defendant] Girouard outlined the $1 trillion opportunity in credit and Upstart's leading role in delivering the AI that is changing how loans are underwritten, automated, and serviced. He also reiterated his four goals for 2025: 10X Upstart's advantage in AI; prepare Upstart's funding supply for *rapid growth*; return to GAAP profitability in the second half of the year; and *giant leaps toward best rates and best process for all*.

> Co-founder and [CTO Defendant] Gu walked investors through the company's journey in developing a vertically integrated AI model trained on over 90 million datapoints. *Gu emphasized how Upstart's use of advanced techniques*—such as proprietary loss functions, embeddings, and dynamic macro modeling—*delivers more accurate underwriting and faster approvals* than traditional lenders.

> [CMO] and [SVP] of Growth [Defendant] Rapport detailed how *Upstart's winning business model—driven by industry-leading AI*, marketplace capital, and brand advantage—*is driving growth across the full credit spectrum*. She positioned Upstart as a "category of one" business that is reshaping borrower expectations with speed and ease.

> [CFO Defendant] Datta showed how *Upstart's growth trajectory, pricing power, margins, operating leverage, and profits have created a unique financial profile that results in business model resilience*. He also pointed to potential future revenue streams for Upstart, including ratable fee revenue, subscriptions, revolving credit, and servicing for all.

30.     On August 5, 2025, Upstart issued a press release reporting its financial results for the second quarter ("Q2") of 2025.  The press release provided Q3 2025 revenue guidance of

---

[2] All emphases herein are added unless otherwise indicated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

approximately $280 million, as well as significantly raised Upstart's previously issued FY 2025 revenue guidance from approximately $1.01 billion to approximately $1.055 billion, as well as its revenue from fees from approximately $920 million to approximately $990 million.

31.     Additionally, the press release quoted Defendant Girouard as touting the Company's purported accelerated growth, stating:

> A year ago, you saw the first signs that Upstart was returning to growth mode - and today you can see it in full bloom . . . . In addition to achieving triple-digit revenue growth, we reached GAAP profitability a quarter sooner than expected and our newer businesses actually accelerated off their amazing growth in the first quarter.

32.     The same day, Upstart hosted a conference call with investors and analysts to discuss its Q2 2025 results.  During the call, Defendant Girouard attributed the Company's positive results in the quarter to Model 22, stating, in relevant part:

> Once again, our growth last quarter was not a result of dramatic macro improvements or Fed rate decreases . . . . *Our growth was primarily on the back of model improvements, which helped to drive conversion rates from 19% in Q1 to 24% in Q2. These wins came first and foremost from Model 22, which we launched in early May.*

33.     Defendant Gu, during the same call, touted Model 22's implementation and higher accuracy in modeling and performance, stating, in relevant part:

> Model 22 made use of neural networks at every level of the model architecture, whereas prior models only made use of neural networks in the base layer. That may sound like a subtlety, but it increased our separation accuracy advantage over our benchmark textbook credit model by 17 percentage points to 171.2%. Equivalently, it decreased the inaccuracy remaining to be solved to 87.5%.
>
> * * *
>
> As of the end of Q2, core underwriting had 91 million borrower repayment events to train on, up from 86 million at the end of the prior quarter.

34.     Defendant Datta, too, touted Model 22's purported enhancements and positive impact on the Company's business and growth during the call, stating, in relevant part:

> [T]ransactional revenue more than doubled year-on-year, *largely reflecting the influence of the aforementioned Model 22*. Separately, servicing fee revenue grew

9

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

by nearly 20% year-on-year as the outstanding book of serviced loans continued to expand.

* * *

Our contribution margin, a non-GAAP metric, which we define as revenue from fees minus variable costs for borrower acquisition, verification and servicing as a percentage of revenue from fees came in at 58% in Q2, up 3 percentage points from the prior quarter and exceeding guidance. This improvement reflects a strengthening take rate in our core borrower segment in addition to the acquisition and operational unit cost efficiencies ***driven in part by Model 22***.

35.    During the question-and-answer ("Q&A") phase of the call, an analyst asked "to hear about . . . the 2 elements of conversion rate, the approval rate and then kind of the acceptance rate" with respect to Upstart's loans, and "how those ratios have maybe changed versus the prior year?"  The analyst further asked, "as we think about the new model," for Defendants to "talk a little bit about the types of people or the profile of the people that may have been rejected before that they're being approved today."  In response, Defendant Gu stated, in relevant part:

I think the short answer is that like we've said a number of times at AI Day and other instances, ***the real power of our model comes from its ability to find many, many small subtle relationships in the data***, and that's happening at multiple levels of the model architecture as we described with Model 22.

And the unfortunate result of that is that it's not like there is one -- well, unfortunate for answering the question is that there's not really one simple answer of like we have suddenly got more high credit score borrowers or more low-income borrowers or anything like that. ***It really is just picking a couple of borrowers from many different sort of parts of the credit fabric, if you will, and then finding borrowers who are more likely to repay than their sort of conventional credit characteristics would suggest.***

36.    Also on August 5, 2025, Upstart filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10-Q").  The Q2 2025 10-Q stated, *inter alia*:

***Transaction Volume is driven by improvements in our AI models and technology***, including our ability to streamline and automate the loan application and origination process.

* * *

10

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Transaction Volume, Dollars increased 154% in the three months ended June 30, 2025 compared to the same period of 2024, and increased 121% in the six months ended June 30, 2025 compared to the same period of 2024. Transaction Volume, Number of Loans increased 159% and 133% in the three and six months ended June 30, 2025 compared to the same period of 2024, respectively. ***These increases were primarily due to [inter alia] model improvements . . . , which resulted in an increase in the number of qualified borrowers*** and more attractive loan offers. The increase in Transaction Volume, Number of Loans was higher than the increase in Transaction Volume, Dollars due to the decrease in average loan size, ***primarily as underwriting model improvements drove higher approval rates*** in smaller dollar categories of loans.

37.    With respect to how improvements in Upstart's AI model purportedly enhanced the Company's conversion rate, the Q2 2025 10-Q stated, *inter alia*, that, "[h]istorically, ***our Conversion Rate has benefited from improvements to our technology, which have made our evaluation of risk more accurate*** and our verification process more automated," and that "[o]ur Conversion Rate increased to 23.9% and 21.7% in the three and six months ended June 30, 2025, respectively, from 15.2% and 14.6% in the same periods of 2024, ***primarily driven by [inter alia] underwriting model improvements***[.]"

38.    Appended as exhibits to the Q2 2025 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Girouard and Datta certified, in relevant part, that the Q2 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

39.    The statements referenced in ¶¶ 28-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants

11

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

made false and/or misleading statements and/or failed to disclose that: (i) Model 22 frequently overreacted to negative macroeconomic signals in performing its risk-separation processes; (ii) accordingly, Model 22's overall accuracy and propensity to increase loan approval rates was overstated; (iii) Model 22's overly conservative assessment of credit and macroeconomic conditions was having a significant negative impact on Upstart's revenue results, rendering the Company's previously issued FY 2025 revenue guidance unreliable and/or unrealistic; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

40.    In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Upstart to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose, *inter alia*, that Model 22 was prone to overreact to negative macroeconomic signals in performing its risk-separation processes, and that its overly conservative assessment of credit and macroeconomic conditions was having a significant negative impact on Upstart's revenue results, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

41.    The truth began to emerge on November 4, 2025, when, during post-market hours, Upstart issued a press release reporting its Q3 2025 financial results. Upstart reported, *inter alia,* Q3 2025 revenue of $277 million, missing its previously issued Q3 2025 revenue guidance of approximately $280 million, as well as consensus estimates by $2.62 million. Upstart also reported that it expected to generate revenue of only $288 million in Q4 2025, significantly below

12

consensus estimates of $303.7 million.  Further, Upstart negatively revised its FY 2025 revenue guidance to approximately $1.035 billion, versus the $1.06 billion consensus estimate and its prior guidance of approximately $1.055 billion, as well as its expected FY 2025 revenue from fees, which it reduced to approximately $946 million from its prior outlook of approximately $990 million.

42.     The same day, also during post-market hours, Upstart held a conference call with investors and analysts to discuss its Q3 2025 financial results.   During the call, Defendants blamed Upstart's disappointing results on Model 22, which they revealed had "overreact[ed]" to macroeconomic signals in the quarter, reducing borrower approvals and conversion rates.

43.     During his prepared remarks on the call, Defendant Girouard stated, *inter alia*:

*[T]ransaction volume on our platform was less than we anticipated.*

*Our risk models responded to macroeconomic signals they observed by moderately reducing approvals and increasing interest rates. This drove a reduction in our conversion rate from 23.9% in Q2 to 20.6% in Q3.*

If you follow the Upstart Macro Index, you would have seen that this macro indicator ticked up modestly in July and August, which is essentially what our model responded to over the course of the quarter. We believe this to be nothing more than a speed bump with UMI [Upstart Macro Index] reverting to lower numbers since.

44.     Despite asserting on the call that "we see no material deterioration in consumer credit strength" "[a]nd in fact, we've seen recent signs of improvement", Defendant Girouard maintained that "[t]he [Model 22] system is behaving exactly as it was designed."  However, in response to an analyst noting "the strong demand in the third quarter," but also "the guidance, which was a little bit below what we were expecting and below the guidance in 2Q", and asking "how do you square these 2 things together",  Defendant Girouard attributed the disconnect to Model 22's tendency to "overreact[]" based on macroeconomic factors, stating:

I think what it really highlights is that *our model took a step towards conservatism during the third quarter, just based on seeing macro factors*.

13

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

And I think that is just a natural thing we might expect. As we said, it's since reverted, but it was a period of time where it saw signals, and it was moving quickly.

*I think maybe overreacting.* I think in some sense, *having a model that overreacts is better than having ones that underreact* because it did revert.

45.     In response to another analyst's question regarding Model 22's impact on Upstart's financial results, Defendant Gu acknowledged that Defendants had "knowingly" calibrated their AI model to be "more conservative on the credit side in earlier parts of the quarter[,]" stating, in relevant part:

So obviously, *we did have a larger increase in applications relative to where the final originations count ended up*.

So I think mechanically, you can infer from that change in the likelihood to convert through the funnel. *Of course, the conversion rates are lower.*

*Now that's in large part . . . because we were knowingly making a choice with our model to be a little bit more conservative on the credit side in earlier parts of the quarter.*

So relative to that model, of course, *we did end up marketing to people who were a little less likely to be approved or a little less likely to convert*, but that's not necessarily a chosen strategy.

46.     In response to yet another analyst's question regarding Model 22's overly conservative assessment of credit, what factor or factors most impacted that assessment, and how Defendants planned to reduce conversion rate volatility driven by that model, Defendant Girouard stated, in relevant part:

[R]eally, *the conservatism in the model is, from our point of view, pretty much the dominant driver of the change in conversion rate*.

So it comes in the form of a small fraction, fewer people approved, the rates they're approved at being a little bit higher, which means just marginally less likely to take that load, and then sometimes the approved loan size is a little smaller.

So that is the basics of *a slightly more conservative twist in the model*. So again, *we don't believe this is anything sustainable*. And we do think that we'll get to a model that's a little less responsive, honestly, and maybe *overresponsive in this particular case.*

14

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

But no, there's no other factor going on, as you saw the application volume is quite strong.

47.    Defendant Gu on the call, meanwhile, acknowledged that Model 22 was "overly responsive" to changes and plagued by "measurement error[s,]" and described the actions Defendants were taking to further refine their AI model:

[T]he thing that I was referencing earlier in my prepared remarks about what happened this quarter and the improvements we've made that we expect to be durable and lasting with respect to reducing variance on this metric *specifically has to do with managing how the model responds to the latest signals in macro*.

So over the last few years, one of the things that we invested the most heavily in was building our models in such a way that we think they are the fastest, most precise at responding to the latest patterns in borrower repayment, including at the macro level.

So if it's like federal employees or if it's like service sector workers or if it's high primness borrowers or low primness borrowers that are being impacted, or it's everybody being impacted by a big macro event, we want our models to be the very fastest at responding and respond as precisely as the data allows.

And so we've made a ton of progress towards that. We're very proud of the sort of system we've designed and built.

*But one of the side effects of that system is that it can be a little overly responsive to the latest changes. And that, in addition to being responsive, there's always some kind of sampling and measurement error.*

You can think about what we have, of course, a large amount of data, but relative to all people in the U.S. or the whole economy, it's still a relatively small sample.

*So there's a natural statistical sampling error that comes about from that. And we were doing a lot of work this quarter on understanding how much natural error there is in the match between the sample and the actual levels of calibration.*

*Then we devised some techniques to be able to shrink that measurement error by about half, so that we don't have as much what I call unwanted variance in this metric.*

*We really just want the model to respond to real changes as opposed to changes that are just measurement error, and we were able to reduce that measurement error by a very significant amount this quarter*, which means that *in future periods, we expect that . . . we will see less volatility in our conversion rates as affected by macro*.

15

48.     Another analyst during the Q&A segment of the call remarked that "it sounds like you're assuming that the conservatism in the model is going to continue in the fourth quarter, despite your comments around the UMI actually starting to show some signs of improvement. Is that correct?"  In response, Defendant Datta acknowledged that "some amount of Q4 was impacted by that UMI rise as well" and that "the model impact in Q3, even though it appears to be abating, will impact Q4 as well."

49.     The foregoing disclosures shocked the market.  For example, on November 5, 2025, *American Banker* published an article entitled "Upstart stock drops as AI model 'overreacts' to macro signals", reporting that "***Upstart's stock plummeted 14.8% not because of poor profits, but because its own AI model intentionally 'tightened the credit box,' causing a miss on loan origination volume***."  Multiple market analysts also quickly reacted to Defendants' disclosures, with Morgan Stanley cutting its price target ("PT") on Upstart's stock to $45.00 from $70.00, noting "the company needs to demonstrate that both its [AI] model and forecasting can sufficiently adapt to UMI volatility"; Goldman Sachs cutting its PT to $40.00 from $54.00, noting "the recent trends in volume are likely to underscore the limited forward visibility in the model"; Citigroup cutting its PT to $80.00 from $100.00; Bank of America cutting its PT to $71.00 from $81.00; Needham cutting its PT to $56.00 from $82.00; and Stephens & Co. cutting its PT to $40.00 from $55.00.

50.     Ultimately, Upstart's stock price fell $4.49 per share, or 9.71%, to close at $41.75 per share on November 5, 2025.

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**SCIENTER ALLEGATIONS**

52.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Upstart securities, Defendant Girouard enriched himself by over $13.5 million by selling 208,335 shares of the Company's common stock, Defendant Datta enriched himself by over $1.4 million by selling 26,985 shares of the Company's common stock, and Defendant Gu enriched himself by over $344,000 by selling 5,000 shares of the Company's common stock.

53.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Upstart's differentiated business potential is predicated on its ability to outperform traditional underwriting models by using its purportedly advanced and accurate AI models to automate loan approvals and other services.  As such, the performance and accuracy of the Company's AI models is of central importance to the Individual Defendants and investors—especially the latest iteration of Upstart's AI models, Model 22.  The Individual Defendants were thus undoubtedly laser-focused on the performance of Model 22 throughout the Class Period, particularly its impact on the Company's business and financial results, as exhibited by their numerous statements regarding these subjects during the Class Period, as detailed *supra*.  Indeed, more than a third of the way into Q3 2025, Defendants significantly raised Upstart's FY 2025 revenue guidance based in substantial part on the purported beneficial impact that Model 22 was having on Upstart's financial results.  However, as later admitted by Defendant Gu during the Q3 2025 conference call, Defendants "***knowingly*** ma[de] a choice with [their] model" to be "more conservative" with respect to credit "in earlier parts of the quarter."  Yet, Defendants failed to apprise investors of the negative impact that Model 22 was having on Upstart's revenues because of its

"overresponsive[ness]" to negative macroeconomic signals—a feature of the model that Defendants Girouard and Gu both maintained was intentional.

54.    Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Upstart securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Upstart securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Upstart or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Upstart;

- whether the Individual Defendants caused Upstart to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Upstart securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

19

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Upstart securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Upstart securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

20

66.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Upstart securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Upstart securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Upstart securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Upstart's finances and business prospects.

68.     By virtue of their positions at Upstart, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

21

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Upstart, the Individual Defendants had knowledge of the details of Upstart's internal affairs.

70.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Upstart. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Upstart's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Upstart securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Upstart's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Upstart securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.     During the Class Period, Upstart securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and

22

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Upstart securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Upstart securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Upstart securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

74.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.    During the Class Period, the Individual Defendants participated in the operation and management of Upstart, and conducted and participated, directly and indirectly, in the conduct of Upstart's business affairs. Because of their senior positions, they knew the adverse

23

non-public information about Upstart's misstatement of income and expenses and false financial statements.

76.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Upstart's financial condition and results of operations, and to correct promptly any public statements issued by Upstart which had become materially false or misleading.

77.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Upstart disseminated in the marketplace during the Class Period concerning Upstart's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Upstart to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Upstart within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Upstart securities.

78.    Each of the Individual Defendants, therefore, acted as a controlling person of Upstart.  By reason of their senior management positions and/or being directors of Upstart, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Upstart to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Upstart and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Upstart.

24

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 7, 2026                                         Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

25

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS